# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 16, 2014

## STATE OF TENNESSEE v. JAMES R. BRISTOW

**Appeal from the Circuit Court for Clay County**
**No. 12CR82     David A. Patterson, Judge**

_____

**No. M2014-00595-CCA-R3-CD - Filed March 17, 2015**

_____

Defendant, James Bristow, was charged by indictment with vehicular homicide by intoxication, vehicular homicide by recklessness, driving under the influence of an intoxicant (DUI), and DUI per se. Defendant pleaded guilty to vehicular homicide by intoxication with an agreed nine-year sentence, and the manner of service to be determined by the trial court. The remaining counts were dismissed in accordance with the agreement. After a sentencing hearing, the trial court ordered Defendant to serve his nine-year sentence in confinement. On appeal, Defendant argues that he should have received an alternative sentence. After a thorough review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

David Brady, District Public Defender; and Allison Rasbury West, Assistant Public Defender, Cookeville, Tennessee, for the appellant, James R. Bristow.

Herbert H. Slatery, III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Randall A. York, District Attorney General; and Mark Edward Gore, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### Background

*Guilty Plea Submission Hearing*

The State presented the following testimony as the factual basis for the trial court's acceptance of the guilty pleas. Sergeant Ashley Mercer of the Tennessee Highway Patrol (THP) testified that on March 2, 2012, at approximately 1:10 p.m., he responded to a two-vehicle traffic accident on Drag Strip Road in Clay County. When he arrived on the scene, Sergeant Mercer observed a black truck "on it's top in the center of the road and a light colored passenger car off the, [sic] which would have been called the southbound." The truck had been traveling northbound. Sergeant Mercer testified that Defendant was the driver of the truck, and Defendant was still located inside the vehicle when Sergeant Mercer arrived. At that time, an attempt was being made to extradite Defendant from the vehicle. Terry Dyer and Lance Groomes were also passengers in the truck with Defendant.

Sergeant Mercer testified that the car had been driven by the victim, ninety-one-year-old Earl Wilkerson. Through his investigation, Sergeant Mercer learned that the victim had been to a nursing home to visit with his wife and daughter before the accident. Sergeant Mercer testified that Trooper Johnny Farley of the THP Critical Incidence Response Team was also on the scene and determined that Defendant's truck was traveling northbound, "crossed into [the] southbound lane, striking the [victim's] Ford Taurus head on." Sergeant Mercer testified that Trooper Danny Fisher collected a blood sample from Defendant. Sergeant Mercer noticed "beer cans, beer caps and stuff in the truck and around the truck." Defendant's blood sample was later sent to the Tennessee Bureau of Investigation (TBI) crime lab for analysis. It was determined that Defendant's blood alcohol content (BAC) was .10.

Sergeant Mercer testified that the victim also had to be extracted from his Ford Taurus, and he was transported to Vanderbilt Medical Center where he later died from injuries that he sustained from the crash. Sergeant Mercer was aware that the victim "had injuries to his left leg; his right ankle; broken, broken [sic] bones; a crushed femur; compressed vertebrae[] in his back; abdomen, injuries to his abdomen area." The cause of the victim's death was determined to be multiple blunt force injuries. Sergeant Mercer testified that Trooper Farley's investigation indicated that Defendant's truck was traveling eighty-four miles per hour at the time of the crash. The posted speed limit on Drag Strip Road was forty-five miles per hour.

Sergeant Mercer testified that Defendant was interviewed by THP investigator Larry Pollard sometime after the accident. Defendant admitted to having "a couple of sips of Jagermeister," and he admitted to driving the truck at the time of the crash. Lance Groomes was also interviewed by law enforcement. He gave a statement indicating that Defendant had consumed alcohol and was driving the truck at the time of the accident. Mr. Groomes stated that they had drank three or four beers each. Terry Dyer was also interviewed and said that he, Mr. Groomes, and Defendant purchased Jagermeister on the day of the crash, and they mixed it with a Monster energy drink. Sergeant Mercer testified that a search warrant was obtained to conduct a forensic examination of Mr. Dyer's cell phone. There were text messages on the phone about drinking and a picture of a Jagermeister bottle. One of the text messages contained the following: "[A]in't nothing better than being drunk with your boys on Friday, hell, it gonna be a good night[.]" The test message had been sent to one of Defendant's friends or relatives. Another text message read, "just now leaving Celina, that forty dollar bottle already gone[.]"

*Sentencing Hearing*

Tiffany Lawson, Defendant's probation officer, testified that she prepared a presentence report in Defendant's case. Defendant chose not to make any statement regarding the case as Ms. Lawson was completing the report. Ms. Lawson testified that Defendant had two prior convictions in Macon County for "dogs running at large," and "underage consumption" of alcohol. For the dogs running at large conviction, Defendant received six months "good behavior probation," and he was ordered to pay restitution. For the underage consumption of alcohol conviction Defendant received a sentence of eleven months, twenty-nine days to be served on probation. The general sessions court also ordered the loss of Defendant's license for one year, and he was ordered to complete an alcohol and drug education class. Ms. Lawson was not aware if Defendant completed the class. She testified that Defendant also had a pending charge for theft of property "one thousand to two thousand dollars and a count of felony vandalism."

Ms. Lawson testified that Defendant had dropped out of high school in the tenth grade, and he had not obtained his GED. Defendant had worked at ABC Technologies prior to the accident, and Ms. Lawson determined that he last worked a full time job in July of 2010. At the time of the sentencing hearing, Defendant was working "part time odds and ends with his father-in-law."

Detective Donnie Crawford of the Macon County Sheriff's Department testified that he investigated the theft of a "thirty-foot cattle trailer" reported missing by Ryan Gregory. According to Detective Crawford the report of the stolen trailer was taken on July 20, 2012. Detective Crawford received information about the trailer and subsequently met with Sheriff

Brandon Boone of Clay County. He and Sheriff Boone drove out to a cabin on North Folk Road in Clay County and found the missing trailer. While they were at the cabin, Defendant arrived in a Ford Explorer. Macon County Sheriff Mark Gammons was also there when Defendant arrived. Defendant indicated that he heard the officers were in the area looking for the trailer, and Defendant wanted to "make things right" by talking to them. Defendant told the officers that he and "Mr. Evans" had stolen the trailer, and they intended to sell it for "scrap." Detective Crawford testified that the trailer was unusable when they found it because the walls had been cut by a cutting torch, and the wheels had been removed. The damaged trailer was then returned to Mr. Gregory. Detective Crawford said that the case was still pending in the Macon County Criminal Court.

THP Trooper Johnny Farley testified that he was assigned to the Critical Incident Response Team, and he conducted the crash reconstruction in Defendant's case. He estimated that Defendant was driving eighty-four miles per hour at the time of the accident, and the posted speed limit on Drag Strip Road was forty-five miles per hour. Trooper Farley testified that Mr. Grooms and Mr. Dyer, who were passengers in Defendant's vehicle, had to be air-lifted from the scene for medical treatment, and he thought that one of the men was substantially more injured than the other. Through interviews with Mr. Grooms and Mr. Dyer later conducted by Trooper Larry Pollard, it was determined that Defendant and the two men had consumed a bottle of Jagermeister before the crash.

David Earl Wilkerson, the victim's son, testified concerning the extensive injuries that he observed to his father after the crash. Mr. Wilkerson testified that prior to the accident, the victim had been to the nursing home. He said, "It was [the victim's] custom every day of his life, the last nine years of his life, to go over and take food that he had prepared for my mother and my other sister. My mother wasn't able to feed herself, so he helped her." Mr. Wilkerson testified that although the victim was ninety-one years old, he still led a very active life.

Kelly Carr, the victim's granddaughter, testified that the victim was a World War II veteran who had received a Silver Star, seven Bronze Stars, a Purple Heart, a Victory Medal, a European/African Middle Eastern Theater Ribbon, a Good Conduct Medal, and an American Campaign Medal. Ms. Carr noted that she did her senior project in high school on the victim concerning his war experiences. Ms. Carr testified that the victim's wife, her grandmother, passed away in August of 2012, after the victim's death in March. Ms. Carr noted that her grandmother, who had Alzeheimer's disease, would not eat for anyone but the victim, and Ms. Carr felt that she "pretty much starved."

Kathleen Browning, the victim's daughter, pointed out that at the time of the crash Defendant was not only intoxicated but his driver's license was expired, he was not wearing

a seatbelt, and he had no insurance. She also noted that the victim's medical bill from Vanderbilt for four hours was over seventy thousand dollars which the victim's insurance had to pay. Ms. Browning also noted that before the wreck, the victim had prepared meals for his wife of sixty-two years, and his disabled daughter. She pointed out that the victim's wife, Ms. Browning's mother, lived only one-hundred and fifteen days after the victim's death. Ms. Browning testified: "She wouldn't eat, at first we could get her to drink a little, but that didn't last long. She spoke very few words, except to call out [the victim's] name." Ms. Browning testified that her special needs sister continuously asks for the victim.

Todd Browning, the victim's grandson, testified that he was devastated by the victim's death. He described the victim as selfless and a man with a high standard of integrity and moral character. Mr. Browning felt that his grandmother grieved and starved herself to death after the victim passed away.

During his allocution, Defendant made the following statement:

I'm sorry. I never meant for that to happen. I know I can't change it, but if I could, I would. I'm sorry. I have a sixteen month old, an almost six year old. I work every day and I really don't want to go to jail. I want to be with my kids and my fiancé. That's all I have to say.

**Analysis**

Defendant contends that the trial court erred in sentencing him. More specifically, he states that the trial court erred in ordering him to serve his nine-year sentence in confinement rather than granting him probation or split confinement. We disagree.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This standard of review extends to alternative sentences as well. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012)("[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence."). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion,

the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court imposes a sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

In considering Defendant's sentence, the trial court considered the record, the purpose and principles of sentencing, and all of the relevant factors and made the following extensive findings:

> In considering the defendant's social history, mental health and other things, the defendant's attorney has shown that on other occasions the defendant has successfully completed probation. He's negative on a drug screen. He has a certain support system, which includes not only a, what the defendant says to be a six year old son and then a minor, a very [sic], a baby. Some indication that he is working part time for his fiance's father, I believe is what's been shown to the court.
>
> *     *     *
>
> The court looks closely at the circumstances of this offense for one thing, to determine how the sentence should be served. The court has been in a position as a prosecutor and as a sentencing court in the past to have very different circumstances in vehicular homicide cases. There are times when there are two friends that are in the vehicle, they decided one of them will drive, one of them [is] drunk. The car goes off the side of the road, one of them is killed, the driver is still alive, not even hurt. The family of the victim of that offense is aware that the victim of the crime is one that would be amenable to the defendant having probation and possibly a deferred sentence of some sort. It's very different than this situation.
>
> The court doesn't sentence because of what a victim's family wants necessarily. It listens to that, but the court looks at the circumstances of the offense. And the circumstance of this offense is very different than what it could be. Eighty[-]four miles an hour, the head-on wreck to another car. Two other people in your car, one who is being life-flighted out, according to certain testimony that we've taken today. Very different than what we're

-6-

speaking of how it could be, how this offense could take place and what the court would possibly be looking at which would be appropriate to alternative sentencing. It's different.

This case, the circumstances of this case are different. And the result of this then can be different.

The defendant's prior offenses are not as concerning to the court because they're misdemeanors. But what is of concern to the court is that the affidavit of complaint in the one case says on 11/22/08, the defendant was stopped in a Honda Accord for muffler violation. The defendant was driving and found to have been consuming intoxicating beverages. He was transported to the Macon County Jail, he would up pleading guilty to possession of alcohol or consumption of alcohol. We are in a car, drinking alcohol. It wasn't a DUI. But it's time when someone should be alerted to the fact that that's not a good idea. And that is of particular importance to this court as it makes its ruling as to how this sentence is to be served.

There are two prior misdemeanors and that's important to the court. But the nature of the one is what's more important to the court, how it is that that offense came and what it was that you were put on probation for. I'm talking to the defendant now, what is it that you were put on probation for.

The next thing that's of importance to the court is if I'm not wrong, this offense occurs on the 2nd of March of 2012, the one that we're here today for. If it's true, in the record today, that you have admitted to committing a D felony three months later. That shows the court that your amenability to correction, I mean someone is dead in this situation. There is a man that has died. There are two people that have been injured. You were, too. But instead of some change of lifestyle, you're admitting to have taken a trailer and torn it apart so that it can be sold for scrap. That's a particular concern to the court, because the court finds that you're not likely to be corrected through probation. It's simple. Commit this in March, [July] steal a trailer, tear it apart.

The court accepted the offer of proof. What was most telling is not that it is based upon hearsay, it's based upon what you said, you did it, you're looking to make it right now. That reason that you're looking to make it right is because they found it.

In considering whether or not probation will serve the ends of justice, the court finds that it won't. This offense with a nine[-]year sentence is particularized by what we're talking about today or what the court has already said. But also this is not a sentence that, this is not a situation where we can say to this community that you can do these things that you did, that you can have these circumstances and then be probated. That's not something that anyone expected as they came in this courtroom today. And it is not of deterrent value to this community and it's not to the defendant, who has been on probation and after being charges has admitted to committing a D felony.

The court does then look to what the state has asked and what the court must look to, which is 40-35-103. It says that sentences which involve confinement should be based upon the following considerations and there's several that the court should look at. One of them is Sub. 1, Sub. A. The state has argued that and the court does not find that to be appropriate. But the court does find that Sub. B is and it says confinement is necessary to avoid depreciating the seriousness of this offense and the court finds that confinement is particularly suited to provide an effective deterrence to others in this community who would be likely to go out and do the same thing. Likely to commit similar offenses.

This same statute has a part to it, which is part 5, and part 5 says the potential or lack of potential for rehabilitation or treatment of the defendant should be considered in determining the sentence alternative, that is whether it's appropriate for probation or the length and the term to be imposed. We already know the length and the term to be imposed. But we should look to see whether the potential for rehabilitation is something that gives this court the understanding that probation is appropriate and the court finds that it's not. Because of the priors and because of what happened since this even. And so part 5 is considered by the court, that's 40-35-103, as it sentences the defendant today to a sentence to serve in the Department of Correction until they determine he is to be released.

In determining "the specific sentence and the appropriate combination of sentencing alternatives," the trial court must consider: (1) the evidence at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement

the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code. Ann. § 40-35-210(b).

Our sentencing law provides that a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who is an especially mitigated or standard offender convicted of a Class C, D, or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. T.C.A. § 40-35-102(5), (6). Additionally, a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider" them. *Id*. § 40-35-102(6)(D). We note that "the determination of whether the [defendant] is entitled to an alternative sentence and whether the [defendant] is entitled to full probation are different inquiries." *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing his or her suitability for full probation, even if the defendant should be considered a favorable candidate for alternative sentencing. T.C.A. § 40-35-303(b); *Boggs*, 932 S.W.2d at 477. In determining whether to grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, both physical and mental; the deterrent effect on the defendant; and the defendant's potential for rehabilitation or treatment. *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

In determining whether incarceration is appropriate, the trial court must consider if:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant....

T.C.A. § 40-35-103(1); *see also State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

Defendant was an eligible candidate for probation. *See* T.C.A. § 40-35-102(6)(A). However, Defendant was convicted of a Class B felony therefore, he is not considered a favorable candidate for alternative sentencing options. Tenn. Code Ann. §§ 39-14-105(5); 40-35-102(6)(A).

Here, the trial court did not abuse its discretion in denying probation or split confinement. The trial court, as recited above, denied probation essentially based on Defendant's lack of potential for rehabilitation and the nature and circumstances of the offenses. The trial court found confinement to be necessary to avoid depreciating the seriousness of the offenses. Although Defendant's criminal record only consists of two misdemeanor offenses, one of those offense involved underage possession and consumption of alcohol while defendant was driving. Defendant received probation for each of his convictions which he successfully completed yet he continued to commit crimes. The trial court properly pointed out that Defendant committed the present offense on March 2, 2012, and in July of 2012, Defendant and another individual stole a cattle trailer and dismantled it to sell for scrap metal. Defendant did not decide to talk to the officers and "make things right" until he learned that they had located the damaged and dismantled trailer.

In this case Defendant and his two passengers consumed a of bottle of Jagermeister, and one of the passengers told police that it was mixed with a Monster energy drink. Defendant's blood alcohol content was determined to be .10. Defendant was traveling eighty-four miles per hour in a forty-five mile per hour zone when his truck struck the elderly victim's car head on killing him. Sergeant Mercer testified that the victim "had injuries to his left leg; his right ankle; broken, broken bones; a crushed femur; compressed vertebrae[] in his back; abdomen, injuries to his abdomen area." The cause of the victim's death was determined to be multiple blunt force injuries. The victim was a highly decorated World War II veteran who had just left the nursing home where he had taken meals that he had prepared to his wife and special needs daughter. The victim's family members testified that the victim's wife, who had Alzheimer's disease, lived only one-hundred and fifteen days after the victim's death. She refused to eat after the victim's death, and she "spoke very few words, except to call out [the victim's] name." The victim's special needs daughter continuously asks for the victim.

For the foregoing reasons, the trial court properly ordered Defendant to serve his nine-year sentence in confinement. The Defendant is not entitled to relief on this issue.

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE